United States District Court
Southern District of Texas
**ENTERED**
May 21, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| WILLIAM ROGERS | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 2:18-CV-421 |
| VS. | § | |
| | § | |
| ISAAC KWARTENG, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION**
**TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff William Rogers is a Texas inmate appearing *pro se* and *in forma pauperis*. In this prisoner civil rights action, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Pending before the Court is a Motion for Summary Judgment filed by Defendants Dr. Isaac Kwarteng and Dr. Brian O'Donnell. (D.E. 97). For the reasons stated herein, it is respectfully recommended that the Court grant this summary judgment motion.

**I.      JURISDICTION**

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331. This case was referred to the undersigned United States Magistrate Judge for case management and to furnish a recommendation pursuant to 28 U.S.C. § 636.

## II.      PROCEDURAL BACKGROUND

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID) and is currently housed at the McConnell Unit in Beeville, Texas. In this civil rights action, Plaintiff sues the following defendants: (1) Dr. Isaac Kwarteng; (2) Physician Assistant (PA) Susanna Corbett; (3) Medical Provider M. Goyel; (4) John Doe Medical Director from Region IV, University Texas Medical Branch (UTMB); and (5) the UTMB. Plaintiff alleges that Defendants acted with deliberate indifference to his serious medical needs by failing to treat his serious diabetic condition with Lantus[1] instead of Humulin and Novolin N (NPH)[2] insulin twice a day. Plaintiff seeks injunctive relief in the form of receiving proper long-acting insulin like Lantus for his diabetes to prevent future harm and appropriate medical care for his related eyesight issues.

Plaintiff subsequently filed a motion seeking immediate preliminary injunctive relief in which he asked the Court to direct Defendants to: (1) treat him immediately with Lantus; (2) provide him with surgery to stop his retinal bleeding in both eyes caused by blood sugar spikes; and (3) appoint him counsel. (D.E. 6). On January 8, 2018, Plaintiff filed a motion for emergency injunction, reiterating that he seeks immediate treatment of his diabetes with Lantus to stop his sugar spikes. (D.E. 20).  Senior United States District

---

[1] Lantus insulin is a long-acting insulin administered once a day.

[2] Humulin and Novolin N (NPH) insulin is a man-made intermediate-acting insulin that starts to work within two to four hours after injection and keeps working for twelve to eighteen hours.

Judge Hilda G. Tagle subsequently denied Plaintiff's motions seeking preliminary and/or emergency injunctive relief. (D.E. 44).

A *Spears*[3] hearing was held on December 20, 2018, where Plaintiff was given an opportunity to explain his claims. On April 15, 2019, the undersigned issued a Memorandum and Recommendation (M&R), recommending that the Court retain only Plaintiff's Eighth Amendment deliberate indifference claims seeking injunctive relief against Dr. Kwarteng and John Doe Medical Director be retained. (D.E. 35). Judge Tagle adopted the recommendation. (D.E. 116). The undersigned ordered service of Plaintiff's complaint on Dr. Kwarteng and John Doe Medical Director (collectively referred to herein as "Defendants"). (D.E. 38).

As part of the answer, Defendants identified Dr. O'Donnell as John Doe Medical Director. (D.E. 45, p. 1). On July 26, 2018, Plaintiff notified the Court that he had designated Dr. Steven Bowers and Pharmacy Clinical Practice Specialist Neha M. Agrawal as expert witnesses. (D.E. 53).

On October 1, 2019, Defendants filed their first Motion for Summary Judgment. (D.E. 57). On May 7, 2020, the undersigned issued a Memorandum and Recommendation (May 7, 2020 M&R), recommending that Defendants' first Motion for Summary Judgment be denied. (D.E. 64).

On May 21, 2020, Defendants filed a motion seeking leave to file a supplemental motion for summary judgment (D.E. 65) along with the supplemental summary judgment

---

[3] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

motion (D.E. 67). In their motion for leave, Defendants sought to present new evidence showing that Plaintiff currently receives a long-acting insulin (Levemir) for his diabetic condition and has received substantial treatment for his vision issues. (D.E. 65, p. 2).

On June 2, 2020, counsel for Defendants and Plaintiff appeared at a telephone conference before the undersigned. While confirming that he has received treatment for his eyesight and is currently being prescribed Levemir, Plaintiff informed the Court that issues remain regarding his medical treatment and his request for injunctive relief. Specifically, Plaintiff stated that: (1) Dr. Kwarteng has failed to make appropriate adjustments to his daily intake of Levemir depending on his blood sugar results; and (2) Plaintiff is not receiving his prescribed insulin regimen on the days he is being transported to other prisons in connection with his scheduled trips to the Hospital Galveston.

Based on the parties' statements provided at the telephone conference, the undersigned stayed the case to allow the parties to address the remaining treatment issues identified by Plaintiff at the telephone conference and possibly this case. (D.E. 72, p. 2). The undersigned further withdrew the May 7, 2020 M&R, denied Defendants' Motion for Summary Judgment (D.E. 57) without prejudice to renew at a later date, and denied Defendants' motion for leave (D.E. 65) and supplemental summary judgment motion (D.E. 67) without prejudice. (D.E. 72, p. 3).

Because the parties were unable to reach a settlement as to Plaintiff's claims for injunctive relief against Defendants, the undersigned reopened discovery and set forth new discovery and dispositive motions deadlines. (D.E. 87). On January 15, 2021,

Defendants filed their second Motion for Summary Judgment.   (D.E. 97).   Plaintiff subsequently filed his response.   (D.E. 115).

## III.   SUMMARY JUDGMENT EVIDENCE

Defendants offer the following summary judgment evidence:

Exh. A:      Plaintiff's Relevant TDCJ Grievance Records from January 1, 2016 to January 23, 2019 (D.E. 98).

Exh. B:      Affidavit and Report of Dr. Bowers, along with attached relevant medical records regarding Plaintiff (D.E. 107-1 through 107-15).

Exh. C:      Affidavit of Ms. Agrawal, along with attached relevant medical records regarding Plaintiff (D.E. 105, 105-1).

Exh. D:      Supplemental Expert Report of Ms. Agrawal, along with attached relevant medical records regarding Plaintiff (D.E. 104, 104-1).

Exh. E:      Second Supplemental Expert Report of Ms. Agrawal, along with attached relevant medical records regarding Plaintiff (D.E. 101).

Exh. F:      Plaintiff's Relevant TDCJ Medical Records from July 11, 2019 to May 11, 2020 (D.E. 102).

Exh. G:      Plaintiff's Relevant TDCJ Medical Records from July 11, 2019 to May 12, 2020 (D.E. 103, 103-1).

Exh. H:      Plaintiff's Relevant TDCJ Medical Records from March 20, 2020 to June 8, 2020 (D.E. 99).

Exh. I:            Plaintiff's Relevant TDCJ Medical Records from May 12, 2020 to November 16, 2020 (D.E. 100).

Plaintiff, in turn, has offered the following summary judgment evidence:[4] (1) his relevant medical records (D.E. 60-1, pp. 1-16, 18-21, 31, 37-39; D.E. 115-1, pp. 1-11, 14-34, 52-57); (2) excepts from Dr. Bowers affidavit (D.E. 60-1, pp. 17, 22-25; D.E. 115-1, p. 35); (3) Plaintiff's relevant grievances and informal I-60 complaints (D.E. 60-1, pp. 26-29; D.E. 115-1, pp. 12-13 36-39; 41-42); (4) Affidavit of Brandi Rogers (D.E. 60-1, p. 30); (5) Affidavit of Opie Toland (D.E. 60-1, p. 32); (6) Affidavit of Fred Hoffman (D.E. 60-1, p. 33); (7) Plaintiff's Affidavit (D.E. 60-1, p. 34); (8) Affidavits of Da-na Allen (D.E. 60-1, p. 35; D.E. 115-1, pp. 45-46); (9) Affidavit of Omar Costillo (D.E. 60-1, p. 36); (10) Disciplinary Proceeding against Plaintiff, dated September 23, 2020 (D.E. 115-1, p. 43); (11) Affidavit of Eduardo Trevino (D.E. 115-1, pp. 44); (12) Affidavit of Damon Earl Lewis (D.E. 115-1, pp. 48); (13) Plaintiff's Medical Passes (D.E. 115-1, p. 51); (14) Plaintiff's verified complaint and attachments thereto (D.E. 1); and (15) Plaintiff's testimony at the *Spears* hearing.

The parties have presented the following undisputed summary judgment evidence:

### A. Plaintiff's Grievance and Filing of Original Complaint

In a Step 1 grievance dated November 5, 2018, Plaintiff complained that: (1) Defendants Kwarteng and Goyel were deliberately indifferent to his serious medical needs when they "made their decision to deny proper insulin" to Plaintiff; (2) during a clinic visit to address his vision loss, Defendants Goyel and Corbett informed Plaintiff

---

[4] A review of Plaintiff's response to Defendants' second summary judgment motion reveals that he has submitted exhibits which are, for the most part, different from the exhibits submitted in support of his response to Defendants' first summary judgment motion. In his response to the second summary judgment motion, Plaintiff references the exhibits attached to his response to the first summary judgment motion. The undersigned, therefore, will review and consider both sets of Plaintiff's evidentiary materials in connection with this recommendation.

that he would not be prescribed with Lantus; (3) all other TDCJ units prescribed Lantus or other insulin; (4) his eyesight has affected him to the point where he cannot read or see properly; and (5) Defendants Kwarteng, Goyel, and Corbett have committed medical malpractice.  (D.E. 98, p. 3).  Plaintiff sought proper medical care for his diabetes.  (D.E. 98, p. 4).

On November 8, 2018, Plaintiff signed this prisoner civil rights complaint, and it is post-marked on November 13, 2018, as mailed to the Court.  (D.E. 1, p. 5).  The Court received his complaint on November 16, 2018.  One day earlier, prison officials returned Plaintiff's Step 1 grievance to Plaintiff, indicating that there had been no documented attempt at informal resolution.  (D.E. 98, p. 4).

### B.  Plaintiff's Medical Conditions and Treatments

Plaintiff testified at the *Spears* hearing that he was diagnosed with Type 2 Diabetes Mellitus (T2DM) in 1998.  Plaintiff further testified that, at the time he was diagnosed, Plaintiff's free world doctor observed that Plaintiff was resistant to NPH insulin, which is a relatively short-acting insulin. Plaintiff, therefore, has a long-standing history of T2DM as well as pancreatitis.  (D.E. 60-1, pp. 3, 7, 24).  In 2008, Plaintiff underwent a gastric bypass.  (D.E. 60-1, p. 3).  Before he entered TDCJ custody on January 4, 2016, Plaintiff had been prescribed several hypertension and diabetes medications, including Lantus.[5]  (D.E. 60-1, p. 24).

---

[5] Lantus insulin is a long-acting insulin administered once a day (D.E. 57-2, p. 3).

Upon his arrival into TDCJ custody in 2016, Plaintiff was administered NPH and regular insulin twice a day. (D.E. 60-1, p. 24). Plaintiff also was prescribed Metformin to control his blood sugar levels. (D.E. 60-1, p. 24). On February 5, 2016, about a month after entering TDCJ custody, Plaintiff was provided with counseling and educational materials regarding his diet for his T2DM. (D.E. 107-1, pp. 3-4).

During the time period between January 2016 and October 15, 2018, Plaintiff was counseled on several occasions by Dr. Kwarteng and other medical providers with regard to diet compliance, exercise, medication compliance, long-term health outcome options, and current treatment rationale. (D.E. 107-1, pp. 4-8). Plaintiff refused the recommended option to take Glipizide, an oral antidiabetic medication that helps manage diabetic retinopathy in T2DM patients. (D.E. 107-1, pp. 11-12). Medical records reflect that Plaintiff refused: (1) on March 5, 2017 and March 5, 2018, recommended visual screenings to monitor any potential eye damage due to his T2DM (D.E. 107-2, p. 8); (2) on September 29, 2017, a referral to Hospital Galveston for a renal ultrasound and Nephrology appointment (D.E. 57-2, p. 9); (3) on March 16, 2016, March 2, 2017, and June 15, 2018, the recommended diabetic diet plan (D.E. 57-2, p. 9); and (4) on several dates in 2016 and 2017, urinalysis testing for diabetic ketoacidosis. (D.E. 107-1, pp. 8-9). Medical records further reflect that between January 26, 2016 and August 13, 2018, Plaintiff refused his insulin injections 104 times. (D.E. 107-1, pp. 9-10).

Plaintiff has had hemoglobin A1c (HgBA1c) tests performed on him on several occasions between January 4, 2016 and August 8, 2019. (D.E. 107-1, pp. 9-10). This blood test, also known as an A1c test, provides a long term look at the patient's average

blood sugar control over the last two to three months.  *See* www.diabetes.org.  Under the Correctional Managed Care (CMC) Pharmacy and Therapeutics Disease Management Guidelines and ADA guidelines, the patient's goal on his HgBA1c test is to be below 7.0%.  (D.E. 105, p. 4; D.E. 107-1, p. 4).   Plaintiff's HgBA1c tests reveal the following scores: (1) February 11, 2016 - 6.8%; (2) August 19, 2016 - 8.9%; (3) December 9, 2016 – 8.3%; (4) February 5, 2017 – 8.4%; (5) March 29, 2017 – 8.9%; (6) May 17, 2017 - 8.2%; (7) August 22, 2017 – 8.1%; (8) October 3, 7.7%; (9) November 8, 2017 – 7.6%; (10) March 8, 2018 – 9.0%; (11) June 22, 2018 – 8.0%; (12) August 15, 2018 – 7.4%; (13) January 23, 2019 -7.1%; (14) February 5, 2017 – 6.7%; (15) March 1, 2019 – 7.2%; (16) May 21, 2019 – 7.8%; and (17) August 8, 2019 – 7.1%.  (D.E. 107-1, pp. 9-10).

Plaintiff was specifically examined and treated by McConnell Unit medical staff on the following days: (1) May 25, 2016 by Physician Assistant Corbett (PA), where his HgBA1c score was 6.8%; (2) January 24, 2017 by Dr. Kwarteng, where his HgBA1c score as of December 9, 2016 was 8.3%; (3) April 6, 2017 by Nurse Practitioner (NP) Rodriguez, where his HgBA1c score as of March 29, 2017 was 8.9%; (4) September 11, 2017 by PA Corbett where his HgBA1c as of August 22, 2017 was 8.1%; (5) September 29, 2017 by PA Corbett where his HgBA1c score was 8.1%; (6) April 3, 2018 by Dr. Kwarteng where his HgBA1c score was 9.0%; and (7) October 15, 2018 by PA Corbett where his HgBA1c score was 7.4%.  (D.E. 107-1, pp. 4-8).

Medical records further reflect that, on October 22, 2018, Plaintiff complained about vision/eye issues in a sick call request.  (D.E.  107-1, p. 11).   While no abnormalities were noted by the nurse, Plaintiff was referred to a medical provider for

further evaluation. (D.E. 107-1, p. 11). On October 30, 2018, NP Goyel examined Plaintiff who was complaining of broken blood vessels in his eyes. (D.E. 107-1, p. 11). Plaintiff stated that his broken blood vessels resulted from uncontrolled blood sugar levels with NPH insulin was not addressing. (D.E. 107-1, p. 11). He denied any double vision, pain, or headache, and requested to be placed on Lantus. (D.E. 107-1, p. 11). After noting that Plaintiff's HgBA1c was down from 9% to 7.4%, NP Goyel recommended Glipizide to control Plaintiff's retinopathy, which Plaintiff refused. (D.E. 107-1, p. 11-12).

After complaining to the McConnell Unit's medical department of vision issues again on November 7, 2018, Plaintiff was referred to the TDCJ's Ophthalmology Clinic that same day. (D.E. 107-1, p. 12). Plaintiff was subsequently seen by the Ophthalmology Clinic on February 19, 2019, March 6, 2019, April 10 and 24, 2019, May 8, 2019, June 5, 2019, and July 11 and 17, 2019. (D.E. 60-1, pp. 7-10; D.E. 107-1, p. 12. (D.E. 60-1, pp. 7-10; D.E. 107-1, p. 12). After being diagnosed with diabetic retinopathy, macular edema, and other related eye issues, Plaintiff received the following treatments: (1) intravitreal Avastin injections in both eyes on April 10, 2019 and May 8, 2019; (2) laser eye surgery for his right eye on July 11, 2019; (3) laser surgery on his left eye on November 14, 2019; and (3) Pan Retinal Photocoagulation (laser treatments) on both eyes on April 24, 2019 and June 5, 2019. (D.E. 104, p. 5; D.E. 105, p. 6; D.E. 107-1, p. 12).

On May 21, 2019, Plaintiff was examined at the Hospital Galveston's Endocrinology Specialty Clinic. (D.E. 60-1, p. 15). Dr. Arjun Haridas, an

endocrinologist, noted that Plaintiff's HgBA1c level had increased to 7.8% and that Plaintiff had hypoglycemia in the morning. (D.E. 60-1, p. 15). Dr. Haridas, therefore, recommended that Plaintiff's medication of glipizide be discontinued in the evening and that his NPH insulin be stopped. (D.E. 60-1, p. 15). In place of NPH insulin, Dr. Haridas prescribed Plaintiff 30 units daily of Levemir, a long-acting insulin similar to Lantus. (D.E. 60-1, pp. 15, 20). Another endocrinologist at the clinic, Dr. Kevin McKinney, agreed with Dr. Haridas's findings and care plan. (D.E. 60-1, pp. 16, 20). On June 26, 2019, Dr. Kwarteng nevertheless ordered Plaintiff to continue with the NPH insulin on a sliding scale.[6] (D.E. 60-1, p. 31).

At the beginning of September 2019, Plaintiff was prescribed "human NPH insulin 30 units in the evening, along with human regular insulin sliding scale twice daily and Metformin 1000 mg twice daily." (DE. 105, p. 3). On September 17, 2019, Plaintiff again was examined at the Hospital Galveston's Endocrinology Specialty Clinic. (D.E. 60-1, p. 15). Dr. Nastassia Souza noted that Plaintiff had "glycemic variations due to missed insulin doses, erratic meal schedules, and also variations to gastric emptying in setting of gastric bypass history." (D.E. 60-1, p. 38-39). Dr. Souza ordered that NPH insulin be stopped and that Plaintiff begin taking 30 units daily of Levemir. (D.E. 60-1, p. 39).

Plaintiff's HgBA1c score as of September 12, 2019 was 7.7%. (D.E. 104, p. 5). On September 19, 2019, Dr. Kwarteng prescribed Plaintiff with Levemir, as

---

[6] In a "sliding scale method, the insulin dose is based on your blood sugar level just before your meal. *See* www.healthline.com/diabetes.

recommended by Dr. Kevin McKinney who is a board-certified endocrinologist.  (D.E. 104, pp. 4-5, 12-15).  Levemir works in a similar fashion as Lantus and is not clinically different in efficacy or safety for targeting hyperglycemia.   (D.E. 104, pp. 4-5).  Specifically, Dr. Kwarteng prescribed Plaintiff with 30 units of Levemir every evening as well as 1 unit of the fast-acting insulin NPR insulin every evening.  (D.E. 104, pp. 14-15).

Plaintiff's HgBA1c score increased to 8.6% on December 16, 2019 and then to 9.1% on January 14, 2020.  (D.E. 115-1, p. 2).  On January 15, 2020, because Plaintiff's HgBA1c had steadily increased since the introduction of Levemir, Dr. McKinney changed Plaintiff's prescription of the long-acting insulin to twenty units twice daily.  (D.E. 104, p. 5; D.E. 104-1, p. 7).  Plaintiff's diabetic treatment with Levemir has been regularly monitored by medical providers at the McConnell Unit and other UTMB specialists such as Dr. Wendy Nguyen.  (D.E. 101, p. 3)   Adjustments have been made to his Levemir, NPR insulin, sliding scale NPR insulin and Metformin prescriptions to improve Plaintiff's insulin and diabetic control.   (D.E. 101, p. 3).  Plaintiff's HgBA1c level was 8.9% on May 19, 2020, 8.5% on September 3, 2020, and 8.6% on November 18, 2020.  (D.E. 101, p. 3).

Dr. Nguyen has interviewed Plaintiff extensively regarding his diet and exercise. Between January 2016 and January 2020, Plaintiff lost 51 pounds to reach a weight of 240 pounds.  Since January 2020, he has gained 15 pounds and is considered obese.  (D.E. 101, p. 4).  Plaintiff's diet during this time period has included commissary purchases consisting of a variety of cookies, chips, nutritional shakes, peanut butter,

cheese, candy, sodas, and fruit sticks.  (D.E. 101, p. 4).  During COVID-19 restrictions, Plaintiff has not had as much access to recreation.  (D.E. 101, p. 4).

On August 19, 2020, after noting that Plaintiff's HgBA1c score was 8.9% as of May, 2020, a recommendation was made to adjust Plaintiff's Levemir and regular insulin to address issues related to his blood sugar levels and hypoglycemia.  (D.E. 115-1, p. 8). A Pharmacotherapy Clinic note, dated October 28, 2020, reflects that Dr. Nguyen reduced Plaintiff's regular NPR insulin to five units in the morning.  (D.E. 115-1, pp. 10-11).   However, Dr. Kwarteng prescribed Plaintiff with seven units of regular NPR insulin.  (D.E. 115-1, p. 11).

On December 2, 2020, after noting Plaintiff's medical records including his last HgBA1c score of 8.6%, Dr. McKinney and Dr. Swati Chopra recommended changing Plaintiff's Levemir prescription to 24 units twice daily as well as adjusting his regular NPR insulin to two units in the morning and eight units in the evening.  (D.E. 101, pp. 12-16).  Dr. Kwarteng prescribed Plaintiff these recommended amounts of Levemir and regular NPR insulin.  (D.E. 101, pp. 18-19).  Plaintiff currently receives Levemir as one of his active insulin medications.  (D.E. 100, p. 979; D.E. 115-1, p. 7).

Plaintiff was last seen by the Ophthalmology Clinic on March 11, 2020.  (D.E. 101, p. 3).  At that time, he received an Avastin injection for his left eye and reported stable vision and no eye pain.  (D.E. 101, pp. 3, 26).  On January 7, 2021, a McConnell Unit medical provider submitted an Ophthalmology referral for a follow-up appointment. (D.E. 101, p. 3).

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence or evaluate the credibility of witnesses.  *Id.*  Furthermore, affidavits or declarations "must be made on personal knowledge, [shall] set out facts that would be admissible in evidence, and [shall] show that the affiant or declarant is competent to testify to the matters stated."  Fed. R. Civ. P. 56(c)(4); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). When a government official has pled the defense of qualified immunity, the burden is on the plaintiff to establish that the official's conduct violated clearly established law. *Id.* Plaintiff cannot rest on his pleadings; instead, he must show a genuine issue of material fact concerning the reasonableness of the official's conduct. *Bazan v. Hidalgo County*, 46 F.3d 481, 490 (5th Cir. 2001).

## V.      DISCUSSION

### A.      Exhaustion

In their second summary judgment motion, Defendants seek dismissal of Plaintiff's deliberate indifference claims against them for failure to exhaust his administrative remedies before filing this action.   (D.E. 97, pp. 6-10).[7]   The Prison Litigation Reform Act, 42 U.S.C. § 1997e, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002).  Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process.  *Booth v. Churner*, 532 U.S. 731, 734 (2001); *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).  A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court.  *Woodford v. Ngo*, 548 U.S. 81, 83 (2006).  Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints.  *Jones v. Bock*, 549 U.S. 199, 215 (2006).

---

[7] In their first summary judgment motion, Defendants did not seek dismissal of this action for lack of exhaustion.

The TDCJ provides a two-step procedure for presenting administrative grievances. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam). Step 1 requires the inmate to present an administrative grievance at his unit within fifteen days from the date of the complained-of incident. *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004). The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has fifteen days to appeal by filing a Step 2 grievance, which is handled at the state level. *Id.* Both steps be completed in order to file suit in federal court. *Id* at 515-16 ("[A] prisoner must pursue a grievance through both steps for it to be considered exhausted."). *See also Dillon v. Rogers,* 596 F.3d 260, 268 (5th Cir. 2010) ("under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion; instead, we have required prisoners to exhaust available remedies properly.").

Prisoners, however, are only required to exhaust administrative remedies that are actually "available" to them. *Davis v. Fernandez*, 798 F.3d 290, 294 (5th Cir. 2015). An administrative remedy is considered unavailable when officials are "unable or consistently unwilling to provide any relief," the administrative remedy scheme is "so opaque that it becomes, practically speaking, incapable of use" by an ordinary prisoner, or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." *See Ross v. Blake*, 136 S. Ct. 1850, 1859–61 (2016).

Because exhaustion is an affirmative defense, Defendants have the burden to demonstrate that Plaintiff failed to exhaust available administrative remedies. *Cowart v.*

*Erwin*, 837 F.3d 444, 451 (5th Cir. 2016).   "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon*, 596 F.3d at 266. "[W]hile it is a question of law whether administrative remedies qualify as being "available" under 42 U.S.C. § 1997e(a)," in a given case and under a given set of circumstances "availability may sometimes turn on questions of fact." *Id*.

Defendants contend that Plaintiff failed to exhaust his claims against with respect to his medical care for his T2DM through both administrative grievance steps.  (D.E. 97, p. 9).   Defendants further contend that Plaintiff cannot demonstrate the grievance procedure was unavailable to him.  (D.E. 97, pp. 9-10).   Plaintiff responds that the grievance procedure was effectively rendered unavailable to him because Senior Practice Manager Tonya Lawson acted in such a way to thwart Plaintiff from exhausting his available remedies.  (D.E. 115, p. 15).

In response to Defendants' first summary judgment motion, Plaintiff submitted an I-60 complaint dated October 22, 2018, in which he complained to the unit's Medical Complaints Coordinator about his diabetes treatment consisting of NPH insulin and damage to his eyes.  (D.E. 60-1, pp. 28-29).   The I-60 was returned to Plaintiff on October 25, 2016 with the notation "PSC."  (D.E. 60-1, p. 28).

In his Step 1 grievance, Plaintiff complained about the medical care provided to him with respect to his diabetes and related eyesight conditions.   (D.E. 98, p. 3). Consistent with his I-60 complaint, Plaintiff stated in the Step 1 grievance that he had attempted an informal resolution of his medical issues with Lawson but that Lawson denied his requested insulin and other medical care.  (D.E. 98, p. 3).  Contrary to  the

evidence presented showing that Plaintiff had sought an informal resolution to his medical issues, Plaintiff's Step 1 grievance reflects that Lawson signed and returned it without a response on the grounds there was no documented attempt at an informal resolution.  (D.E. 98, p. 4).

When viewing the competent summary judgment in a light most favorable to Plaintiff, genuine issues of material fact exist as to whether Lawson handled Plaintiff's informal and Step 1 grievance in such a manner as to thwart Plaintiff's ability to exhaust his available remedies.  Even though Plaintiff filed his original complaint a days before receiving the response to the Step 1 grievance, Lawson's response lends credence to the idea that resolution through both steps of the grievance process was never available to Plaintiff.  He, therefore, has presented disputed issues of fact on the issue of whether the TDCJ's grievance process was truly available to him at that time to exhaust the deliberate indifference claims presented in this case. *See Ross*, 136 S. Ct. at 1859–61; *Wheater v. Shaw*, 719 F. App'x 367, 369 (5th Cir. 2018).  Accordingly, the undersigned respectfully recommends that Defendants' summary judgment motion should be denied on the issue of exhaustion. The undersigned now turns to consider the merits of Plaintiff's deliberate indifference claims.

### B.    Mootness

Article III of the Constitution limits the jurisdiction of federal courts to actual cases and controversies.  U.S. Const., Art. III, § 2.  This article requires parties seeking to invoke federal court jurisdiction to demonstrate they have a legally cognizable interest or personal stake in the outcome of a case. *Genesis Healthcare v. Symczyk*, 569 U.S. 66, 71

(2013); *Payne v. Progressive Financial Services, Inc.*, 748 F.3d 605, 607 (5th Cir. 2014). A live controversy must exist at every stage of the litigation. *Genesis*, 569 U.S. at 71.

A claim becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). In other words, if a controversy between parties resolves to the point that they no longer qualify as "'adverse parties with sufficient legal interests to maintain the litigation,'" a court is without power to entertain the particular claim. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 324 (5th Cir. 2009) (quoting *United States v. Lares-Meraz*, 452 F.3d 352, 351 (5th Cir. 2006) (per curiam)). Courts, therefore, lack "constitutional jurisdiction" to resolve an issue where there is no Article III controversy. *See Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999).

Defendants contend that that Plaintiff's claims are now moot because: (1) he has been prescribed Levemir in addition to the fast-acting NPH insulin since September 19, 2019; and (2) he has received Avastin injections and laser eye surgeries to correct his vision and prevent further vision loss. (D.E. 97, pp. 10-14). Plaintiff responds that Defendants have never actually treated his diabetes and related vision issues and have done everything to prevent Plaintiff from receiving appropriate and consistent care, as directed by TDCJ medical providers, for his diabetes. (D.E. 115, p. 18). He further contends that Levemir is a weaker version of Lantus. (D.E. 115, p. 13).

Plaintiff seeks relief in this lawsuit in the form of receiving a long-acting insulin like Lantus instead of regular NPH insulin control his diabetes and help his related vision issues. Plaintiff sought to be treated with Lantus alone because his blood sugar levels

were under control in the free world due to being prescribed Lantus.   While Plaintiff currently receives the long-acting insulin Levemir, the competent summary judgment evidence show that he also receives NPH insulin as part of his regimen to control his blood sugar levels.   Plaintiff also correctly points out that medical officials, including Dr. Kwartang, are constantly adjusting his insulin levels.   While Plaintiff has received extensive treatment for his diabetic retinopathy and related vision issues, he has never been prescribed Plaintiff Lantus alone to treat his T2DM.

When viewing the competent summary judgment in a light most favorable to Plaintiff, genuine issues of material fact exist as to whether Plaintiff's claims for injunctive relief should be dismissed as moot.   Accordingly, the undersigned respectfully recommends that Defendants' summary judgment motion be denied on the issue of mootness.

### C. Deliberate Indifference

Plaintiff claims that Defendants have acted with deliberate indifference to his serious medical needs.   Prisoners are protected from cruel and unusual punishment by the Eighth Amendment.   While not mandating a certain level of medical care for prisoners, the Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate medical care.   *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

Prison officials are liable for failure to provide medical treatment if they are deliberately indifferent to a prisoner's serious medical needs.   *Estelle v. Gamble*, 429 U.S. 97 (1976).   Deliberate indifference may be exhibited by prison doctors in their

response to prisoners' needs, but it may also be shown when prison officials have denied

an inmate prescribed treatment or have denied him access to medical personnel capable

of evaluating the need for treatment.  *Id.* at 104-05.  A prison official acts with deliberate

indifference if she knows that an inmate faces a substantial risk of serious harm and

disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S.

825, 847 (1994).  The official must both be aware of facts from which an inference of

substantial risk of serious harm can be drawn and also draw the inference.  *Easter*, 467

F.3d at 463.  A prison official's knowledge of substantial risk may be inferred if the risk

was obvious.  *Id.*

"Deliberate indifference is an extremely high standard to meet."  *Domino v. Texas

Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  In the context of medical

treatment, the prisoner must show "that prison officials refused to treat him, ignored his

complaints, intentionally treated him incorrectly, or engaged in any similar conduct that

would clearly evince a wanton disregard for any serious medical needs."  *Gobert v.

Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citation

omitted).  Delay in treatment may be actionable under § 1983 only if there has been

deliberate indifference and the delay results in substantial harm.  *Stewart v. Murphy,* 174

F.3d 530, 537 (5th Cir.1999); *Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir. 1993).

"An inmate displaying diabetic symptoms conveys a serious medical need, and a

defendant's failure to respond to that need may constitute deliberate indifference."

*Oakley v. Hudson*, No. 2:13-CV-102, 2013 WL 3561173, at *6 (S.D. Tex. Jul. 11, 2013)

(citing *Gobert,* 463 F.3d at 345 n. 12).

Although inadequate medical treatment may rise to the level of a constitutional violation, "unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment, absent exceptional circumstances." *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012). Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citations omitted).

Defendants contend in their second summary judgment motion that Plaintiff has failed to demonstrate that they acted with deliberate indifference to Plaintiff's serious medical needs. (D.E. 97, pp. 20-23). Even assuming that they provided inadequate medical treatment, Defendants argue that their conduct as shown by the objective medical record does not amount to a constitutional violation. (D.E. 97, p. 23). Defendants further argue that Plaintiff's deliberate indifference claims should be dismissed due to their lack of personal involvement. (D.E. 97, pp. 14-17).

Plaintiff responds that that factual disputes exist to preclude summary judgment in Defendants' favor. (D.E. 115, pp. 3-5, 7-8)). He further contends that each defendant was personally involved to the extent that: (1) Dr. O'Donnell has implemented a policy at the McConnell Unit that not long-acting insulin be used unless the inmate has complications with his diabetes and loses a limb; and (2) Dr. Kwarteng knowingly uses the policy to deny proper insulin for all diabetics at the McConnell Unit. (D.E. 115, pp. 6-7). Plaintiff contends that the evidence presented shows that Defendants acted with

deliberate indifference to his serious medical conditions by not continuing to prescribe him with Lantus when he arrived at the McConnell Unit in 2016.  (D.E. 115, p. 9).

In initially recommending that the Court deny Defendants' first summary judgment motion be denied, the undersigned determined that fact issues existed as to whether Defendants acted with deliberate indifference to Plaintiff's serious medical needs by failing to prescribe him a long-acting insulin such as Lantus instead of NPH insulin. (See D.E. 64). However, upon careful review of all the evidence now presented in this case, the undersigned concludes that Defendants' second summary judgment motion should be granted for the reasons discussed below.

The uncontroverted summary judgment evidence presented shows that Plaintiff has a long-standing history of T2DM as well as pancreatitis, that Plaintiff underwent a gastric bypass in 2008, and that, before he entered TDCJ custody on January 4, 2016, Plaintiff had been prescribed several hypertension medications.  (D.E. 60-1, p. 3, 7, 24). The objective medical records presented reveal that Plaintiff has received the following medical attention for his serious T2DM condition since his arrival into TDCJ custody until the time he filed this case: (1) Plaintiff has been administered NPH and regular sliding scale insulin twice a day (D.E. 60-1, p. 24); (2) Plaintiff also was prescribed Metformin to control his blood sugar levels (D.E. 60-1, p. 24); (3) Plaintiff was examined and treated for his diabetic condition by McConnell Unit medical staff, including Dr. Kwarteng; on several occasions between May 25, 2016 and October 15, 2018 (D.E. 107-1, pp. 4-8); and (4) each time Plaintiff was examined and treated, he was counseled with

regard to diet compliance, exercise, medication compliance, long-term health outcome options, and current treatment rationale (D.E. 107-1, pp. 4-8).

Rather than show deliberate indifference, the summary judgment evidence presented in this case shows that Dr. Kwarteng provided Plaintiff substantial and ongoing medical attention. Since Plaintiff arrived at the McConnell Unit, he has been on an intensive insulin regiment which consisted for the first few years of NPR and regular sliding scale insulin. According to Ms. Agrawal, a Pharmacy Clinical Practice Specialist, this diabetic regimen for treatment of T2DM was appropriate pursuant to the Correctional Managed Care (CMC) Pharmacy and Therapeutics approved T2DM Disease Management Guidelines and is in accordance with the 2019 American Diabetes Association (ADA) Standards of Medical Care. (D.E. 105, p. 3).

Under the CMC Pharmacy and Therapeutics Disease Management Guidelines and ADA guidelines, the diabetic's goal on his HgBA1c test is to be below 7.0%. (D.E. 57-8, p. 4). The objective medical evidence shows that Plaintiff's HgBA1c fluctuated from 2016 through 2019 while he was prescribed with NPH and regular insulin. Indeed, Plaintiff's HGBA1c score was tested on numerous occasions during this time period, and his scores ranged from 6.8% on February 11, 2016, to a high of 9.0% on March 8, 2018, and then to a low of 6.7% on February 5, 2019. (D.E. 107-1, p. 9).

The majority of Plaintiff's tests yielded scores which were above the goal of 7.0%. Defendants have presented evidence showing that Plaintiff refused various treatments, procedures, and medications from 2016 through 2018 for his T2DM and related vision issues. Medical records reflect that between January 26, 2016 and August 13, 2018,

Plaintiff refused his insulin injections 104 times.  (D.E. 57-2, pp. 9-10; D.E. 26-5; D.E. 26-5).  Dr. Bowers opined that there was, in most instances, a direct correlation between Plaintiff's refusals to take insulin and his HgBA1c results.  (D.E. 57-2, p. 9).

Plaintiff's results, however, do not appear to show a clear correlation between his refusal to take insulin and his HgBA1c results.  For instance, his second highest score of 8.9% on March 17, 2017 occurred after he had only refused insulin on two occasions.  (D.E. 107-1, p. 9).  Further, his third highest score of 8.4% on February 17, 2017 occurred after he had no refusals of his prescribed insulin.   (D.E. 107-1, p. 9).  Nevertheless, the uncontroverted summary judgment evidence establishes that many factors such as Plaintiff's diet, weight, and lack of exercise contributed to Plaintiff's failure to reach the 7.0% goal in many of his HgBA1c scores.  (D.E. 60-1, p. 38-39; D.E. 101, p. 4; D.E. 107-1, p. 9).  Dr. Bowers opined that these additional factors also affected the results.  (D.E. 107-1, p. 9).

Plaintiff testified at the *Spears* hearing that, before entering TDCJ custody, he was prescribed with Lantus for his diabetes and that his free world doctor observed him to be resistant to NPH insulin.  Plaintiff, however, has presented no objective medical evidence to substantiate his testimony that he was NPH insulin resistant.  Furthermore, at least on a few occasions during this time period, Plaintiff was able to reach the recommended HgBA1c goal while receiving NPH and regular insulin.

Plaintiff complains that Dr. Kwarteng often contradicted the orders of the diabetic experts, such as Dr. McKinney and Dr. Wendy Nguyen, by maintaining Plaintiff on NPR insulin and improperly adjusting his insulin treatment.   (D.E. 115, pp. 10-14). The

uncontroverted summary judgment evidence shows that Plaintiff began receiving the long-acting insulin Levemir on September 19, 2019, after endocrinologists at the Hospital Galveston ordered Plaintiff in May and September 2019 to receive the long-acting insulin Levemir.  (D.E. 60-1, pp. 15, 16, 20, 38-39; D.E. 104, pp. 4-5).  While Dr. Kwarteng initially resisted ordering Levemir, the objective medical records show that on September 19, 2019, Dr. Kwarteng followed Dr. McKinney's order and prescribed Plaintiff with 30 units of Levemir every evening as well as 1 unit of the fast-acting insulin NPR insulin every evening.  (D.E. 104, pp. 14-15).

The objective medical evidence reflects that, even upon the introduction of Levemir,  Dr. Kwarteng has provided Plaintiff with continuous and focused medical attention for his T2DM while his HgBA1c has fluctuated well above the goal of 7.0 to 8.6% on December 16, 2019, to 9.1% on January 14, 2020, and then to 8.6% on December 2, 2020.  (D.E. 115-1, pp. 2, 8).  The record reflects that the Galveston diabetic experts as well as Dr. Kwarteng have ordered adjustments to Plaintiff's insulin regimen in an effort to control his blood sugar levels. While the objective medical records show that Dr. Kwarteng deviated in isolated instances from the orders and recommendations issued by the diabetic experts, Dr. Kwarteng has continued to prescribe Plaintiff with Levemir as recommended by them. Plaintiff otherwise has failed to establish Dr. Kwarteng as acting in an intentional or wanton manner toward Plaintiff's medical T2DM condition.

Plaintiff contends that his diabetic retinopathy and other related vision conditions progressed rapidly as soon as he was prescribed NPH insulin instead of Lantus upon

being housed at the McConnell Unit in 2016.  The objective medical evidence reflects that Plaintiff first complained to the McConnell Unit medical department about his first vision/eye complaints in October and November 2018 and that he was quickly referred to Ophthalmology in November 2018.  (D.E. 107-1, pp. 11-12).  After being diagnosed with diabetic retinopathy, macular edema, and other related eye issues, Plaintiff received the following treatments: (1)  intravitreal Avastin injections in both eyes on April 10, 2019 and May 8, 2019; (2) laser eye surgery for his right eye on July 11, 2019; (3) laser surgery on his left eye on November 14, 2019; (3) Pan Retinal Photocoagulation (laser treatments) on both eyes on April 24, 2019 and June 5, 2019; and (4) after receiving an Avastin injection for his left eye at the Ophthalmology Clinic on March 11, 2020, Plaintiff reported stable vision and no eye pain.  (D.E. 101, p. 3).  (D.E. 101, pp. 3, 26; D.E. 104, p. 5; D.E. 105, p. 6; D.E. 107-1, p. 12).

Plaintiff has presented no objective medical evidence to show that his serious vision issues were caused directly by the decision to prescribe NPH insulin as opposed to Lantus.  On the other hand, Ms. Agrawal has cited three trials and a study as establishing two significant factors associated with Plaintiff's development of diabetic retinopathy: (1) Plaintiff's lengthy duration in having diabetes; and (2) hyperglycemia.  (D.E. 105, pp. 6-7).  According to Mr. Agrawal, the fact that Plaintiff had not received a long-acting insulin such as Lantus or Levemir did not result in Plaintiff's development of diabetic retinopathy.  (D.E. 105, p. 7).  The uncontroverted summary judgment evidence establishes that Dr. Kwarteng and his staff promptly addressed Plaintiff's vision issues

after first learning of them on October 22, 2018 and then making a timely referral to the Ophthalmology Clinic on November 7, 2018.  (D.E. 60-1, pp. 7-10; D.E. 107-1, p. 12).

Plaintiff has presented no evidence to suggest that Dr. O'Donnell, the second defendant remaining in this case, personally participated in Plaintiff's course of treatment for his T2DM and related vision issues.  "Personal involvement is an essential element of a civil rights cause of action."  *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).  It is well established that a prison supervisor cannot be held liable for the misconduct of his or her subordinates. *See Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987).  "Supervisory officials may be held liable only if: (1) they affirmatively participate in acts that cause constitutional deprivation; or (2) implement unconstitutional policies that causally result in plaintiff's injuries." *Mouille v. City of Live Oak, Tex.*, 977 F.2d 924, 929 (5th Cir. 1992).

Plaintiff and inmate Castillo provided statements that Dr. O'Donnell implemented a policy whereby no long-acting insulin such as Levemir or Lantus would be prescribed unless the inmate suffered the complication of losing a limb.  (D.E. 60-1, pp. 34, 36).  Plaintiff, however, has provided no competent summary judgment evidence to support the existence of such a policy.  The objective medical evidence establishes that Plaintiff has been and is currently receiving a long-acting insulin even without the loss of a limb.  Plaintiff otherwise has not established a causal connection between the actions of Dr. O'Donnell and Plaintiff's alleged injuries.

As discussed above, Plaintiff has failed to show that Dr. Kwarteng acted with deliberate indifference to his serious medical needs. The objective medical evidence

presented in connection with the second summary judgment motion rebuts any claim that Dr. Kwarteng intentionally ignored Plaintiff's complaints concerning his T2DM and related vision issues, refused to provide him with care, or otherwise intentionally or wantonly delayed necessary medical care.  *See Baneulos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) ("Medical records of sick calls, examinations, diagnosis, and medications may rebut an inmate's allegations of deliberate indifference"); *Turner v. Moffett*, No. 3:12-CV-220, 2013 WL 5214070, at *3 (S.D. Tex. Sep. 17, 2013) (recognizing that the court may find allegations to be implausible when contradicted by the objective medical evidence); *Alexander v. Dickerson*, No. 6:08cv404, 2009 WL 2244139, at *9 (E.D. Tex. Jul. 27, 2009) (concluding that conclusory allegations or unsubstantiated assertions cannot defeat a summary judgment motion).

Overall, Plaintiff's complaints regarding the medical treatment received by Dr. Kwarteng for his T2DM and related vision issues amount to his disagreement over the course of treatment he has received. *See Whiting v. Kelly*, 255 F. App'x 896, 899 (5th Cir. 2007) ("Although [plaintiffs] clearly believe that they should undergo additional testing and drug therapies, such disagreement does not give rise to a constitutional claim.") (citations omitted).  While the undersigned sympathizes with Plaintiff's frustration about the medical care received for his serious medical conditions, his disagreement with the overall course of his treatment and unhappiness with the medical care afforded to him are insufficient to state a § 1983 claim. *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).  Even after noting Plaintiff's documented struggles to control his blood sugar levels and address his vision

issues while under Dr. Kwarteng's care, the competent summary judgment evidence presented demonstrates **at best** that this defendant's actions nay have amounted to either negligence or medical malpractice and not deliberate indifference. *See Sama*, 669 F.3d at 590.

Accordingly, even when viewing the evidence in favor of Plaintiff, he has failed to establish a genuine issue of material fact on whether Defendants treated him with deliberate indifference in violation of the Eighth Amendment. Because Plaintiff fails to establish that relief is available under § 1983, Defendants should be entitled to summary judgment in their favor.

### D.   Qualified Immunity

Defendants contend that they are entitled to qualified immunity which shields them from constitutional liability in their individual capacities.[8]   (D.E. 97, pp. 24-25). The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.   *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).   "To discharge this burden, the plaintiff

---

[8] Plaintiff did not indicate in his complaint whether he sought to sue the named defendants in their individual capacities, official capacities, or both.   At the screening stage, the Court retained Plaintiff's deliberate indifference claims generally against Defendants.   Accordingly, the undersigned will address Plaintiff's claims against Defendants both in their individual and official capacities.

must satisfy a two-prong test. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). First, he must claim that the defendant committed a constitutional violation under current law. *Id.* Second, he must claim that the defendant's action was objectively reasonable in light of the law that was clearly established at the time of the complained-of actions. *Id.*

It is often but not always appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation has occurred. *See Pearson*, 555 U.S. at 236. In this case, because Plaintiff has failed to state cognizable constitutional claims against Defendants, it is not necessary to examine whether Defendants' actions were objectively reasonable. Accordingly, the undersigned respectfully recommends that Defendants are entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims asserted against them in their individual capacities.

### E.    Eleventh Amendment

Defendants contend that they are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacities for injunctive relief. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotations and modifications omitted). Thus, the *Ex parte Young* exception applies when (1) a plaintiff has pled a valid claim for a violation of federal law against a state official responsible for enforcing the law at issue in that person's official capacity; (2) the claim

seeks only prospective injunctive relief; and (3) the claim seeks to address a "continuing violation of federal law." *Walker v. Livingston*, 381 F. App'x 477, 478-79 (5th Cir. 2010) (per curiam) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996)).

Plaintiff's claims seeking injunctive relief against Defendants in their official capacities are subject to dismissal on the basis that Plaintiff's underlying deliberate indifference claims lack factual support. *See Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. Sep. 28, 2015) (explaining that "a claim for injunctive relief is a remedy that does not stand alone, but requires a viable underlying legal claim"). Because Plaintiff cannot establish his Eighth Amendment claims, he cannot show that he is suffering from an continuing violation of his Eighth Amendment rights. Accordingly, the undersigned respectfully recommends that Plaintiff's claims against Defendants in their official capacities for injunctive relief are barred by the Eleventh Amendment.

## VI.    RECOMMENDATION.

Based on disputed fact issues as to whether Plaintiff's administrative remedies were available to him and whether Plaintiff has received his requested injunctive relief, it is respectfully recommended that Defendants' Motion for Summary Judgment (D.E. 97) be **DENIED** on the issues of exhaustion and mootness.

Defendants have demonstrated that no genuine issue of a material fact exists as to whether they were deliberately indifferent to Plaintiff's serious medical needs, their entitlement to qualified immunity, and whether Plaintiff's claims for injunctive relief are barred by the Eleventh Amendment. Thus, it is respectfully recommended that

Defendants' Motion for Summary Judgment (D.E. 97) be **GRANTED** and that Plaintiff's

deliberate indifference claims against them be **DISMISSED with prejudice**.

      Respectfully submitted this 21st day of May, 2021.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).